UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                     :

PATRICK DONOHUE, Individually and as Parent and  :
Natural Guardian of S.J.D., *et al.*,         :
          :
        Plaintiffs,    :
          :

    -v-      :     22 Civ. 8998 (JPC)
          :

DAVID C. BANKS, in his Official Capacity as  :   FINDINGS OF FACT AND
Chancellor of the New York City Department of  :   CONCLUSIONS OF LAW
Education, *et al.*,        :
          :
        Defendants.   :
          :
------------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

On October 24, 2022, the parents of eighteen students with disabilities initiated this putative class action against David C. Banks, in his official capacity as Chancellor of the New York City Department of Education, the New York City Department of Education (the "DOE") (together with Banks, the "City"), and Brad Lander, in his official capacity as Comptroller of the City of New York (collectively, "Defendants"),[1] alleging that Defendants violated the stay-put provision of the Individuals with Disabilities Education Act ("IDEA"). As relevant to the instant ruling, on September 30, 2023, the Court held that under the stay-put provision, four students—

---

[1] Since the commencement of this litigation, Banks has been replaced as Chancellor of the New York City Department of Education by Kamar Samuels, *see* NYC Public Schools, Chancellor Kamar H. Samuels, https://www.schools.nyc.gov/about-us/leadership/nycps-leadership-and-offices/chancellor (last visited June 8, 2026), and Lander has been replaced as Comptroller of the City of New York by Mark Levine, *see* New York City Comptroller, About Mark Levine, https://comptroller.nyc.gov/about/about-mark-levine/ (last visited June 8, 2026). In accordance with Federal Rule of Civil Procedure 25(d), the Clerk of the Court is respectfully directed to substitute Kamar Samuels, in his official capacity as Chancellor of the New York City Department of Education, for David C. Banks, and Mark Levine, in his official capacity as Comptroller of the City of New York, for Brad Lander, as Defendants in the caption of this case.

D.O., Z.C., J.B., and S.J.D.—were entitled to reimbursement of transportation costs "only for those days when the students took the transportation to [] school." *Donohue v. Banks*, No. 22 Civ. 8998 (JPC), 2023 WL 6386014, at *11 (S.D.N.Y. Sept. 30, 2023).

The parties disagreed about how many days the students had utilized transportation to attend school, however, so the Court held an evidentiary hearing over a series of days to resolve the matter. Based on the Court's factual findings and legal conclusions, as set out below, the Court concludes that, for their children's transportation to and from school during the 2022-2023 school year, Plaintiff Jumoke Ogunleye should be reimbursed $162,810, Plaintiff Crysal Crosley should be reimbursed $166,860, Plaintiff Donna Cornett should be reimbursed $55,890, and Plaintiff Patrick Donohue should be reimbursed $94,598.

## I. Background

### A.    Statutory Scheme

The IDEA is "an ambitious federal effort to promote the education of handicapped children." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 179 (1982). It accomplishes its goal through a project of "cooperative federalism." *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 52 (2005) (internal quotation marks omitted). Congress "provides federal money to assist state and local agencies in educating handicapped children, and conditions such funding upon a State's compliance with extensive goals and procedures." *Rowley*, 458 U.S. at 179.

The IDEA's central requirement is that participating States provide disabled children with a "free appropriate public education" ("FAPE"). 20 U.S.C. § 1412(a)(1)(A); *see Fry v. Napoleon Cmty. Schs.*, 580 U.S. 154, 166 (2017) (discussing "the primacy of a FAPE in the statutory scheme"). A FAPE consists of "special education"—*i.e.*, "specially designed instruction . . . to

meet the unique needs of a child with a disability"—as well as "related services"—*i.e.*, those "supportive services . . . required to assist a child . . . to benefit from" that instruction.  20 U.S.C. § 1401(9) (defining a FAPE); *id.* § 1401(26) (defining "related services"), *id.* § 1401(29) (defining "special education").  In order to tailor a FAPE "to the unique needs of [a] handicapped child," *Rowley*, 458 U.S. at 181, States must create an annual "individualized education program" ("IEP") for each disabled child, 20 U.S.C. § 1414(d), that delineates the particular instruction and supportive services that a child will receive in the coming school year.  *See Honig v. Doe*, 484 U.S. 305, 311 (1988) (describing IEPs as "the centerpiece of the statute's education delivery system for disabled children").  The instruction and supportive services in an IEP must be "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 399 (2017).

Parents may resist an IEP for their child that they believe is insufficient in either of two ways.  First, "parents who think that the state has failed to offer their child a FAPE . . . may pay for private services, including private schooling, and then seek reimbursement from the school district." *T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 152 (2d Cir. 2014).  Alternatively, instead of "unilaterally chang[ing] their child's placement during the pendency of review proceedings," *Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass.* ("*Burlington*"), 471 U.S. 359, 373-74 (1985), "parents are entitled to have the child 'stay put' in his or her 'current educational placement'" at public expense during the pendency of a challenge to the IEP, *Bd. of Educ. of Pawling Cent. Sch. Dist. v. Schutz*, 290 F.3d 476, 481 (2d Cir. 2002) (quoting 20 U.S.C. § 1415(j)).  A student's "current" placement is "whatever educational placement was last agreed upon" by the parent and the local education agency.  *T.M.*, 752 F.3d at 171.  Especially relevant here, when a state administrative officer has found a private school

3

placement to be appropriate in a particular year, the education agency's "consent to the private placement [for that year] is implied by law." *Schutz*, 290 F.3d at 484.

If an education agency fails to abide by its obligation to maintain a child's current educational placement during the pendency of a parent's challenge to an IEP, then regardless of whether the parent's challenge ultimately succeeds, "a court may award various forms of retroactive and prospective equitable relief, including reimbursement of tuition, compensatory education, and other declaratory and injunctive remedies." *Doe v. E. Lyme Bd. of Educ.*, 790 F.3d 440, 454 (2d Cir. 2015); *see also Burlington*, 471 U.S. at 369 (explaining that a district court has "broad discretion" to "'grant such relief as the court determines is appropriate'" (quoting 20 U.S.C. § 1415(e)(2), now codified at 20 U.S.C. § 1415(i)(2)(C)(iii))). An "'educational placement' refers only to the general type of educational program in which the child is placed," however. *T.M.*, 752 F.3d at 171 (internal quotation marks omitted). Thus, "the pendency provision does not guarantee a disabled child the right to remain in the exact same school with the exact same service providers." *Id.*; *see Concerned Parents & Citizens for the Continuing Educ. at Malcolm X (PS 79) v. N.Y.C. Bd. of Educ.*, 629 F.2d 751, 753, 755 (2d Cir. 1980) (adopting "a restrictive interpretation of the meaning of 'educational placement'" as "refer[ring] only to the general type of educational program in which the child is placed").

Regardless of whether a parent unilaterally changes her child's placement or elects for her child to "stay put," she must "set[] forth [her] alleged violation" of the IDEA in a Due Process Complaint, 20 U.S.C. § 1415(b)(6)(B), and, following a preliminary meeting with the "IEP Team," *id.* § 1415(f)(1)(B)(i); *see id.* § 1414(d)(1)(B) (defining "IEP Team"), be heard before the State or local education agency in "an impartial due process hearing," *id.* § 1415(f)(1)(A). In New York, an Independent Hearing Officer ("IHO") presides over the due process hearing. *See Murphy v.*

*Arlington Cent. Sch. Dist. Bd. of Educ.*, 297 F.3d 195, 197 (2d Cir. 2002) (describing New York's system of administrative review). Any decision of an IHO may be appealed to a State Review Officer ("SRO"), 20 U.S.C. § 1415(g)(1), and if a parent is "aggrieved by the findings and decision" of the SRO, she may then "bring a civil action with respect to [her due process] complaint" in state or federal court, *id.* § 1415(i)(2)(A).

By providing a cause of action only to parties "'aggrieved' by a 'final' decision of either an impartial hearing officer, if the state does not have an appeals process, or the state review officer, if it does," the IDEA ordinarily "requires that any available administrative remedies be exhausted before a lawsuit is filed in federal court." *Ventura de Paulino v. N.Y.C. Dep't of Educ.*, 959 F.3d 519, 530, n.40 (2d Cir. 2020) (citing 20 U.S.C. § 1415(i)(2)(A)). "[A]n action alleging violation of the stay-put provision falls within [an] exception[] to this [requirement]," however, allowing a parent to assert such a claim in state or federal court even without commencing administrative proceedings. *Murphy*, 297 F.3d at 199.

## B.  Factual and Procedural History

On October 24, 2022, the parents of eighteen students with disabilities initiated this action, alleging that Defendants violated the stay-put provision of the IDEA by failing to maintain their children's current educational placements during the 2022-2023 school year while their challenges to their children's IEPs were pending. Dkt. 1. The parties' dispute centered on whether, and to what extent, Defendants were obligated to reimburse Plaintiffs for payments they made pursuant to the parents' year-long contracts with a transportation company called Sisters Travel and Transportation Services, LLC ("Sisters"), which charges a monthly flat rate for transportation services without regard for how often a student uses such services. *See Donohue*, 2023 WL 6386014, at *3.

At this stage, only the claims relating to four children—D.O., Z.C., J.B., and S.J.D.—remain a part of this action. For each of these students, at the time a dispute arose over the child's 2022-2023 IEP, the current educational placement was based on previous order of a New York State administrative officer. With regard to D.O., on December 23, 2021, an IHO found that for the 2021-2022 school year, an appropriate placement "include[d] specialized transportation costs . . . for the dates of attendance [at school]." Dkt. 65 ("Dainow Decl."), Exh. P at 9. With regard to Z.C., on June 29, 2022, an IHO found that during the 2021-2022 school year, an appropriate placement included "special education transportation at [the] New York state Medicaid rate for comparable transportation services for the actual number of days . . . [that Z.C.] was transported" to school. Dainow Decl., Exh. K at 20. With regard to J.B., on May 29, 2021, an IHO found that for the 2020-2021 school year, an appropriate placement required "that the district directly fund the costs of transportation . . . at a fair market rate based on comparable transportation . . . to and from the private [school] that were actually provided." Dainow Decl., Exh. F at 60. Finally, with regard to S.J.D., on November 7, 2022, an IHO found that for the 2021-2022 school year, an appropriate placement required the City to "directly fund the costs of transportation . . . at a fair market rate based on comparable transportation . . . to and from the private [school] that were actually provided." Dainow Decl., Exh. Q at 10.

On September 30, 2023, the Court ruled, *inter alia*, that Defendants had violated the stay-put provision of the IDEA by not paying for the costs of D.O.'s, Z.C.'s, J.B.'s, and S.J.D.'s transportation to and from school during the 2022-2023 school year. *Donohue*, 2023 WL 6386014, at *10-11; *see Zvi D. by Shirley D. v. Ambach*, 694 F.2d 904, 906 (2d Cir. 1982) ("To cut off public funds would amount to a unilateral change in placement, prohibited by the Act."). As a remedy, the Court ordered Defendants to reimburse these students' "costs for transportation that was in fact

provided—as in, only for those days when the students took the transportation to the school."
*Donohue*, 2023 WL 6386014, at *11. Accordingly, the Court directed Plaintiffs to "submit to the
DOE paperwork reflecting the days of the students' actual attendance at school." *Id.* And on July
15, 2024, after denying Plaintiffs' request for additional relief, the Court directed the parties to
confer and "jointly propose a deadline by which they [would be] prepared to file a proposed
judgment consistent with the Court's decisions." *Donohue v. Banks*, No. 22 Civ. 8998 (JPC), 2024
WL 3413278, at *6 (S.D.N.Y. July 15, 2024).

The parties could not agree on a proposed judgment, with Defendants repeatedly
challenging Plaintiffs' documentation concerning when D.O., Z.C., J.B., and S.J.D. used
transportation services to attend school. Plaintiffs first provided Defendants with a declaration
from Arthur Mielnik, the Director of Strategic Planning at the International Institute for the Brain
("iBrain")—the school which D.O., Z.C., J.B., and S.J.D. attended during the 2022-2023 school
year—listing the dates when he determined each student attended iBrain in person. *See* Dkt. 107
(status letter from Plaintiffs) at 1; Dkt. 121, Exh. 1 ("Mielnik Decl."). Maintaining that this sole
declaration was insufficient to establish the dates of actual attendance, Defendants requested that
"the Court order Plaintiffs to provide Defendants with the documentation [Mielnik] relied upon in
drafting his declaration." Dkt. 107 at 2. Plaintiffs then furnished Defendants with over 7,000
pages of redacted documents that Mielnik relied upon, as well as declarations from the students'
parents that, according to Plaintiffs, "establishe[d] that the students used [Sisters] on the dates in
which they attended iBrain" in person. Dkt. 111. On November 18, 2024, Defendants submitted
a letter "request[ing] that the Court enter a judgment determining that Plaintiffs are not entitled to
reimbursement for transportation," because, in Defendants' view, "the facially irreconcilable,

contradictory paperwork provided by Plaintiffs" was not "a sufficient reflection of actual attendance." Dkt. 115 at 1-2.

Given these disputes, the Court held an evidentiary hearing over three separate days to determine the relief owed to Plaintiffs. First, on January 23, 2025, Mielnik testified. *See* Minute Entry, Jan. 23, 2025; Dkt. 133 ("Jan. 23 Hr'g Tr."). At the end of the January 23 hearing, the Court instructed Plaintiffs to provide Defendants with updated declarations from the four students' parents addressing whether the students used Sisters every day they attended iBrain in person, and instructed Defendants to inform the Court whether they desired an opportunity to cross examine the parents at a subsequent hearing. *Id.* at 104:14-107:12. On March 17, 2025, after receiving the updated parent declarations from Plaintiffs, *see* Dkt. 144-1 ("Crosley Decl."); Dkt. 144-2 ("Donohue Decl."); Dkt. 144-3 ("Ogunleye Decl."); Dkt. 144-4 ("Cornett Decl."), Defendants asked the Court to continue the evidentiary hearing with testimony from those parents, because, in Defendants' view, the declarations contained a "risk of perjury and faulty parental memory," Dkt. 139 at 1.

The Court then held two more days of the evidentiary hearing, during which parents of the four children testified. Plaintiffs Jumoke Ogunleye, the mother of D.O., and Crysal Crosley, the mother of Z.C., testified on May 21, 2025. *See* Minute Entry, May 21, 2025; Dkt. 159 ("May 21 Hr'g Tr."). Then, on May 27, 2025, the remaining two parents testified—Plaintiffs Donna Cornett, the mother of J.B., and Patrick Donohue, the father of S.J.D. *See* Minute Entry, May 27, 2025; Dkt. 157 ("May 27 Hr'g Tr."). On June 13, 2025, the parties submitted post-hearing letter briefs. Dkt. 155 ("Defts. Br."); Dkt. 156 (Plaintiffs' brief).

8

## II.  Legal Standards

"In an action tried on the facts without a jury," a district judge "must find the facts specially and state its conclusions of law separately."  Fed. R. Civ. P. 52(a)(1).  "It is within the province of the district court as the trier of fact to decide whose testimony should be credited."  *Krist v. Kolombos Rest. Inc.*, 688 F.3d 89, 95 (2d Cir. 2012).  Accordingly, the Court below sets forth its findings of fact, *see infra* III, followed by its conclusions of law, *see infra* IV.

## III.  Findings of Fact

Over the three days of the evidentiary hearing, the Court received in evidence declarations from Mielnik and each of the four parents and also heard live testimony from these five witnesses.  Jan. 23 Hr'g Tr. at 3:15-99:14 (Mielnik); May 21 Hr'g Tr. at 3:15-28:24 (Ogunleye), 30:14-48:7 (Crosley); May 27 Hr'g Tr. at 2:23-28:1 (Cornett), 28:14-45:5 (Donohue).  The Court also received in evidence over 7,000 pages of session notes pertaining to the four students at issue.  Jan. 23 Hr'g Tr. at 51:14; *see* D.O. Session Notes; Z.C. Session Notes; J.B. Session Notes; S.J.D. Session Notes.  After reviewing and considering this evidence, the Court makes the following findings of fact.

### A.    Days of Actual Attendance at iBrain

Mielnik listed in his declaration the dates that he determined each of D.O., Z.C., J.B., and S.J.D. attended iBrain in person during the 2022-2023 school year.  Mielnik Decl. ¶¶ 3, 7, 9, 11.  To compile this list of attendance dates, Mielnik reviewed over 7,000 pages of individual session notes.  *Id.*  As Mielnik explained at the hearing, session notes are written records created each time a teacher, teaching assistant, or other service provider works with a student and document what occurred during that particular instructional or therapeutic session.  Jan. 23 Hr'g Tr. at 5:12-6:1.  The session notes are generally created within twenty-four hours of a session and uploaded to iBrain's internal online dashboard, which tracks all session notes for all students.  *Id.* at 6:2-9.

To determine the days when each student attended iBrain in person, Mielnik downloaded and reviewed each session note created for that student during the 2022-2023 school year.  *Id.* at 7:19-25.  If Mielnik found more than one session note from a particular day indicating the student's in-person attendance, he recorded such attendance in his declaration.  *Id.* at 7:22-25.  At the January 23 hearing, Mielnik demonstrated in great depth how he determined whether a student was present at iBrain on a given day based on the session notes.  For example, Mielnik walked through his determination that D.O. was physically present at iBrain on July 6, 2022.  The first session note of that day, which reflected D.O.'s receipt of musical therapy, indicated only that a "home program or remote service was provided," which did not show "whether or not [D.O.] was present."  *Id.* at 10:24-11:3; *see* D.O. Session Notes at 1.  So Mielnik turned to other session notes from that day. A session note from a speech and language pathologist indicated that D.O "was present and that the session occurred in the classroom."  Jan. 23 Hr'g Tr. at 11:3-9; *see* D.O. Session Notes at 2-3. Another session note for occupational therapy similarly indicated that the service was provided at iBrain—this time in the school's gym.  Jan. 23 Hr'g Tr. at 11:10-14; *see* D.O. Session Notes at 4-5.  Similarly, session notes from D.O.'s physical therapy provider and academic teacher listed iBrain as the location of the services provided.  Jan. 23 Hr'g Tr. at 11:15-22; *see* D.O. Session Notes at 6-8.  From these session notes, Mielnik confidently concluded that D.O. attended iBrain in person on July 6, 2022.  Jan. 23 Hr'g Tr. at 10:20-24.  In all, Mielnik meticulously walked through his conclusions as to in-person attendance for thirty-two different dates, distributed among all four students.  *Id.* 10:20-51:5.  For each individual date, Mielnik performed a similar analysis, identifying the relevant session notes and explaining how those notes showed that the student was physically present at iBrain that day.  *Id.*  Mielnik further testified that, since initially drafting his

10

declaration, he twice again reviewed the session notes and came to the same conclusions as to the days each student attended iBrain in person. *Id.* at 8:13-24.

The Court finds that Mielnik testified credibly. He demonstrated a clear understanding of iBrain's internal systems and described a logical and methodical process for identifying each student's in-person attendance based on nearly contemporaneously-created session notes. His testimony was coherent, consistent, and corroborated by documentary evidence, including the thousands of session notes provided to the Court, and by his walkthrough of specific examples on the witness stand. As mentioned above, Mielnik explained that he only recorded a student's in-person attendance if multiple session notes affirmatively indicated that the relevant student was physically present on that day, reflecting a careful and cautious review of those records. Jan. 23 Hr'g Tr. at 7:18-25. His demeanor while testifying was measured and forthcoming, and his conclusions remained consistent even after repeated reviews of the same data set. Mielnik's testimony was further supported by the testimony of the four students' parents, who each affirmed that the number of in-person days Mielnik identified aligned with their general recollections of how often their child attended iBrain in person. *See* May 21 Hr'g Tr. at 17:12-18:10 (Ogunleye), 38:19-39:12 (Crosley); May 27 Hr'g Tr. at 11:5-6 (Cornett), 41:1-6 (Donohue).

In their post-hearing submission, Defendants challenge the session notes as "an unreliable source for attendance" given their "contradictory and ambiguous" nature. Defts. Br. at 2. The Court disagrees. Although the session notes were not completely error free, *see, e.g.*, Jan. 23 Hr'g Tr. at 45:9-46:18 (Mielnik acknowledging that a session note included a clerical error, shown by its contradiction by five other session notes from the same day); *see* Z.C. Session Notes at 906-912, Mielnik's cautious approach to marking a student as present appropriately accounted for such errors, *see, e.g.*, Jan. 23 Hr'g Tr. at 79:18-80:3 (Mielnik explaining that, despite any clerical errors,

he would only mark a student as present if "at least two to three, if not more[,] session notes" confirmed in-person attendance). *See also id.* at 23:1-24:5 (explaining that session notes reflecting different treatments for the same student at the same time indicated "co-treatment" with multiple service providers working together).[2]  The Court therefore credits Mielnik's testimony in full with respect to the number of days each of the four students attended iBrain in person.

Defendants also challenge the sufficiency of Mielnik's testimony by arguing that he has no knowledge—either independently or based on his review of the session notes—of whether the four students used Sisters each time they attended iBrain in person. Defts. Br. at 3.  The Court agrees with this observation, but that was not the purpose of Mielnik's testimony.  Indeed, Mielnik acknowledged that the session notes do not reflect *how* each student was transported to and from iBrain, either in general or on any days that the student left school early.  Jan. 23 Hr'g Tr. at 24:10-25, 61:10-63:2.  And Mielnik did not testify that he knew whether the four students at issue used Sisters (or for that matter, any other particular means of transportation) to travel to and from the school.

Accordingly, based on Mielnik's testimony, as well as the Court's independent review of the session notes, the Court finds by a preponderance of the evidence that, during the 2022-2023 school year, D.O. attended iBrain in person for a total of 201 days,[3] Z.C. attended iBrain in person

---

[2] Defendants' argument about the frequency of clerical errors in the sample of documents discussed at the January 23 hearing, *see* Defts. Br. at 2, is unpersuasive.  Prior to that hearing, the Court reviewed the 7,000 pages of session notes provided by Plaintiffs and identified session notes from twenty-three days that appeared to be ambiguous or inconsistent. Dkt. 129.  In his testimony, Mielnik addressed the session notes from each of those twenty-three days and, where appropriate, clarified any ambiguities or possible inconsistencies.  Jan. 23 Hr'g Tr. at 21:2-51:5.  The Court disagrees with Defendants' suggestion that any errors in these handpicked outliers reflect an error rate that is representative of that in all 7,000 session notes.

[3] Although Mielnik declared that D.O. "attended iBrain for a total of 203 days during the 2022-2023 school year," he listed only 201 dates.  Mielnik Decl. ¶ 11.  Plaintiffs appear to assume

for a total of 206 days, J.B. attended iBrain in person for a total of 82 days, and S.J.D. attended iBrain in person for a total of 203 days.  *See* Mielnik Decl. ¶¶ 3, 7, 9, 11.

**B.      The Students' Transportation To and From iBrain**

To determine how each student traveled to and from iBrain on the days that they were present at the school, the Court considered the declarations and the in-court testimony of the four parents, as well as Defendants' challenges to that testimony.

In their declarations, which were signed under penalty of perjury, each parent testified that "[n]o other person or company [aside from Sisters] transported [their child] to and from home and school during the 2022-23 extended school year," that "Sisters was the sole transportation provider for [their child] each and every day [their child] attended iBrain in-person during the 2022-23 school year," and that "[e]ach time [their child] was present, in-person, at iBrain, [the child] was transported to and from the school by Sisters."  Crosley Decl. ¶¶ 8, 9, 21; *accord* Donohue Decl. ¶¶ 8, 9, 21; Ogunleye Decl. ¶¶ 8, 9, 23; Cornett Decl. ¶¶ 8, 9, 21.  For the most part, though not entirely, the parents' in-court testimony was consistent with these absolute statements in their declarations.

Ogunleye testified, for example, that Sisters was "the only mode of transportation" for D.O. and that "D.O. [went] to school with Sisters Transportation only."  May 21 Hr'g Tr. at 15:5-9; *see also id.* at 27:18-28:16 (testifying that every day that D.O. attended iBrain during the 2022-2023 school year, only Sisters provided transportation for the child and there was never an occasion when he missed a bus).  Donohue also was unequivocal in explaining that Sisters always provided transportation for S.J.D. to and from iBrain.  May 27 Hr'g Tr. at 33:8-10.  Although he did not

---

that this was a simple addition error and the Court will treat it as such.  *See* Ogunleye Decl. ¶ 21 ("It seems that based on Mr. Mielik's review of [D.O.'s] session notes, [D.O] attended iBRAIN 201 days during the extended school year.").

recall whether Sisters ever used Uber—as opposed to its own vehicle—to transport S.J.D. to iBrain during the 2022-2023 school year, Donohue testified that he was "sure it[ had] probably occurred" at some point since 2018.  *Id.* at 43:21-44:4.

Crosley similarly testified that at "the end of the school day," the only way Z.C. traveled home was with Sisters.  May 21 Hr'g Tr. at 42:6-17.  When Z.C. was sent home early from school due to an illness, however, "she would be sent home via cab."  *Id.* at 42:18-21.  According to Crosley, that happened only "about twice" during the 2022-2023 school year.  *Id.* at 42:12-43:3. The Court's independent review of the session notes similarly reveals that Z.C. was sent home from school early due to sickness only twice during that school year—on April 5, 2023, and on April 27, 2023.  *See* Z.C. Session Notes at 1376-78, 1431-33.

Finally, Cornett also testified that Sisters transported J.B. to and from iBrain most times that J.B. attended school in person.  Cornett added that, "[i]f something were to happen with the [medical] van, [Sisters] would send an Uber" to transport J.B. to or from iBrain.  May 27 Hr'g Tr. at 13:22-24.  Cornett did not recall how many times this happened during the 2022-2023 school year, *id.* at 15:17-20, but she testified that it was "[i]nfrequent" and only occurred "if there was some mechanical problem with the van," *id.* at 25:17-22.  Additionally, Cornett testified that she was "sure there was at least one circumstance or two circumstances where [her husband] would have driven [J.B.] to school" during the 2022-2023 school year, but she could not recall the specific dates that happened.  *Id.* at 26:11-27:14; *see also id.* at 5:16-18.  She explained that her husband would drive J.B. to school because "sometimes there's things going on at the school, and if we don't have nurses, then, you know, he could have driven her to school, like that type of situation." *Id.* at 27:11-13.

Defendants argue that the parents' testimony did not "bolster or meaningfully support Plaintiffs' showing of actual in person attendance." Defts. Br. at 3-4. As mentioned above, however, each parent independently corroborated Mielnik's conclusion by testifying to the general frequency of their child attending iBrain in person. May 21 Hr'g Tr. at 17:12-18:10 (Ogunleye), 38:19-39:12 (Crosley); May 27 Hr'g Tr. at 11:5-6 (Cornett), 41:1-6 (Donohue). It is of no moment—nor at all remotely surprising—that a parent was unable to recall the exact number of days their child spent home from school over two years earlier. Mielnik's testimony and the session notes sufficiently demonstrated the number of in-person attendance days for each student.

Defendants also challenge the reliability of the parents' testimony on the ground that they were not always home for their child's departure to or arrival from iBrain, and thus they may not have known whether Sisters provided transportation that day. Defts. Br. at 4. Although the parents may not have been present every time their child was transported to school, Ogunleye, Crosley, and Cornett each testified that they would always be informed—either by a family member, a nurse, a paraprofessional, or otherwise—when their child was transported to school and whether anything was out of the ordinary. May 21 Hr'g Tr. at 18:14-17 (Ogunleye), 46:13-48:2 (Crosley); May 27 Hr'g Tr. at 22:18-24:17 (Cornett). Donohue testified that an overnight respite and a nurse were both with S.J.D. every morning, even on days that Donohue was not present for pickup, and that his wife owns Sisters, sufficiently corroborating his testimony that there was never an occasion during the 2022-2023 school year that S.J.D. was transported to or from school in a manner other than by Sisters (either in Sisters's own vehicle or in an Uber retained by Sisters). May 27 Hr'g Tr. at 31:24-33:10, 34:14-16.

Finally, Defendants note that the parents testified to the "usage of cabs or Uber" to transport the students and argue that "there is no reliable evidence to ascertain whether this scenario occurred

frequently or infrequently." Defts. Br. at 4-5. The Court disagrees. Although the parents testified that occasionally alternative transportation may have occurred, by that same testimony, those events were rare and generally arose only due to unforeseen circumstances, such as a mechanical problem with the medical van or the student being sent home early due to illness. *See* May 27 Hr'g Tr. at 25:17-22 (Cornett); May 21 Hr'g Tr. at 42:18-43:3 (Crosley).

With respect to credibility, the Court finds that three of the four parents—Ogunleye, Crosley, and Donohue—testified truthfully and to the best of their ability. Each acknowledged the limitations of their memory and gave thoughtful, measured answers when appropriate. Their demeanor was sincere and respectful, and their testimony was consistent with Mielnik's analysis. The Court thus credits the testimony of these parents in full. Cornett, by contrast, presented conflicting indicia of credibility. During cross-examination, her demeanor was combative and she often failed to answer direct and simple questions, undermining her credibility as a witness. *E.g.*, May 27 Hr'g Tr. at 13:19-18:22; *see id.* at 14:3-7 (the Court admonishing Cornett for repeatedly pushing back on clear questions). Cornett's credibility was partially rehabilitated on re-direct examination, however, when she gave a clear and detailed account of how J.B. was routinely transported to and from iBrain. *Id.* at 22:5-27:14. During that questioning, she credibly explained that she knew when J.B. did not attend school because Cornett herself would need to remain home on those occasions. *Id.* at 22:22-23:9. And she clarified her earlier testimony about how J.B. was occasionally transported to iBrain in an accessible Uber vehicle, rather than a Sisters van. *Id.* at 24:18-25:24. In all, the Court largely credits Cornett's testimony on these matters.

Accordingly, the Court finds by a preponderance of the evidence based on the declarations and live testimony from the four parents that, during the 2022-2023 school year:

- Sisters transported D.O. 402 times—providing round-trip service on each of the 201 days he attended iBrain in person.

- Sisters transported Z.C. 410 times—providing round-trip service on 204 of the days she attended iBrain in person, and one-way service on the two days she left iBrain early due to illness.  On two occasions when Z.C. left school early due to illness, she was transported to her home by cab.

- Sisters transported J.B. 148 times—providing round-trip service on 74 of the 82 days she attended iBrain in person.  For the other sixteen trips during the school year, Sisters used Uber to transport J.B. or J.B. was transported to school by Cornett's husband.  On that last point, the Court also finds that Cornett's husband drove J.B. to school on two occasions.[4]

- Sisters transported S.J.D. 406 times—providing round-trip service on each of the 203 days she attended iBrain in person.  This included any rare occasion when Sisters used an Uber to transport S.J.D.

Lastly, these four parents addressed in their declarations the daily transportation costs of Sisters for the children's trips to and from iBrain during the 2022-2023 school year.  Ogunleye attested that the cost for each trip for D.O. to or from iBrain was $405, Ogunleye Decl. ¶ 27; Crosley attested that the cost for each trip for Z.C. to or from iBrain also was $405, Crosley Decl. ¶ 25; Cornett attested that the cost for each trip for J.B. to or from iBrain was $345, Cornett Decl. ¶ 25; and Donohue attested that the cost for each trip for S.J.D. to or from iBrain was $233, Donohue Decl. ¶ 25.  Defendants have not disputed this testimony, which the Court credits.

## IV.  Conclusions of Law

As discussed above, upon finding a violation of the stay-put provision, a district court has "broad discretion" to "'grant such relief as the court determines is appropriate.'"  *Burlington*, 471

---

[4] Although Cornett testified that J.B. was typically transported to iBrain in a Sisters van, she could not specify how many times during the 2022-2023 school year J.B. instead traveled by Uber or with Cornett's husband, stating only that such instances were infrequent and that she was "sure there was at least one circumstance or two circumstances where [her husband] would have driven [J.B.] to school."  May 27 Hr'g Tr. at 25:17-22, 26:11-27:14.  The Court thus estimates that, during the 2022-2023 school year, J.B. was not transported by a Sisters vehicle for 10% of the trips and that there were two occasions when Cornett's husband drove J.B. to iBrain.

17

U.S. at 369 (quoting 20 U.S.C. § 1415(e)(2), now codified at 20 U.S.C. § 1415(i)(2)(C)(iii)); *see also E. Lyme Bd. of Educ.*, 790 F.3d at 454 ("[A] court may award various forms of retroactive and prospective equitable relief, including reimbursement of tuition, compensatory education, and other declaratory and injunctive remedies."). Indeed, "[t]he only restriction is that the relief is to be appropriate in light of the purpose of the Act." *E. Lyme Bd. of Educ.*, 790 F.3d at 454 (internal quotation marks omitted); *see, e.g.*, *Polera v. Bd. of Educ. of Newburgh Enlarged City Sch. Dist.*, 288 F.3d 478, 486 (2d Cir. 2002) ("The purpose of the IDEA is to provide educational services, not compensation for personal injury, and a damages remedy—as contrasted with reimbursement of expenses—is fundamentally inconsistent with this goal.").

This Court's September 30, 2023 Opinion and Order determined that the appropriate relief in this case was reimbursement for the costs of transporting D.O., Z.C., J.B., and S.J.D. "for transportation that was in fact provided—as in, only for those days when the students took the transportation to the school." *Donohue*, 2023 WL 6386014, at *11. Each Plaintiff had sought reimbursement for the entire year-long transportation contract with Sisters, but that amount would exceed what Defendants were required to pay under the administrative orders establishing the four students' current educational placements, which only required the students to be provided with transportation on the days they actually attended school. *See* Dainow Decl., Exh. P at 9; Dainow Decl., Exh. K at 20; Dainow Decl., Exh. F at 60; Dainow Decl., Exh. Q at 10; *see also Burlington,* 471 U.S. at 370-71 ("Reimbursement merely requires the [defendant] to belatedly pay expenses that it should have paid all along and would have borne in the first instance."). To be sure, in connection with the students' current educational placement, each Plaintiff had been using a year-long Sisters contract to provide such transportation. That fact, however, did not require Defendants to fund the same exact contracts during the pendency of the challenges to the students' IEPs,

18

especially where the prior administrative orders established a reimbursement obligation limited to only days the transportation services were actually provided.  *Cf. T.M.*, 752 F.3d at 171 (explaining that "the pendency provision does not guarantee a disabled child the right to remain in the *exact same* school with the *exact same* service providers" because "'educational placement' refers only to the *general* type of educational program in which the child is placed" (citation modified)). Similarly, even though Plaintiffs already had entered into a new contract with Sisters for the 2022-2023 school year, Defendants did not need to repay the costs of a contract that provided services for days the students did not attend school and thus exceeded the services the stay-put provision required.  *Cf. Ventura de Paulino*, 959 F.3d at 533 ("[I]t is the City, not the Parents, that is authorized to decide how . . . the Students' pendency services are to be provided.").[5]

Although the Court required reimbursement for the cost of transportation on the days the students actually attended school, Defendants now argue that Plaintiffs also should not be reimbursed for transportation on those days the students were transported by Ubers or cabs—as opposed to Sisters's own vehicles—to attend school or travel home.  Defts. Br. at 4-5.  The Court disagrees.  The students' current educational placement required Defendants to make available, on all days the students attended school, transportation of the same "general type" as had been provided the students under their current educational placements.  *T.M.*, 752 F.3d at 171 (internal quotation marks omitted); *see* Dainow Decl., Exh. P at 9; Dainow Decl., Exh. K at 20; Dainow Decl., Exh. F at 60; Dainow Decl., Exh. Q at 10.  Since Defendants failed to fulfill that obligation, it is appropriate that they reimburse Plaintiffs for the full cost of the transportation services that

---

[5] Requiring reimbursement for the full costs of services that the parents paid for, when those costs exceeded what was required under the stay-put provision, would risk making "the stay-put obligation contingent on the means of a child's family," *E. Lyme Bd. of Educ.*, 790 F.3d at 456, because those parents with the means to pay for more expensive services out-of-pocket would subject the local educational agency to larger reimbursement obligations.

Defendants were supposed to have offered on the days the students attempted to utilize such services. This reimbursement obligation includes those occasions when a student was transported in a cab or an Uber because a Sisters vehicle was experiencing mechanical issues or because a student fell ill and had to be excused early.

By contrast, Defendants should not have to reimburse Plaintiffs for the cost of Sisters transportation on the two occasions during the 2022-2023 school year when Cornett's husband chose to drive J.B. to iBrain. When Cornett was asked the reason why her husband drove J.B. to school on those days, her only explanation was that "sometimes there's things going on at the school, and if we don't have nurses, then, you know, he could have driven her to school, like that type of situation." May 27 Hr'g Tr. at 27:8-13. Plaintiffs' counsel did not follow-up with any further clarification from Cornett. This taciturn explanation, coupled with the absence of evidence from Plaintiffs that Cornett's husband was in any way coordinating with Sisters in making such trips, leads the Court to conclude that these trips were not part of the transportation services that Defendants were obligated to provide. Nor is there any evidence that Defendants failed to make available transportation services on those occasions. Rather, it appears that regardless of whether Defendants had offered transportation services satisfying the stay-put provision, Cornett's husband would have still transported J.B. to school on these days. As such, Defendants should not be obligated to reimburse the costs of such trips.

The Court thus concludes that Plaintiffs should be reimbursed for the cost per trip under the Sisters contracts for each date their child attended iBrain in person when transportation services were provided, which yields the following amounts:

- Ogunleye is entitled to $405 per trip,[6] *see* Ogunleye Decl. ¶ 27, for the cost of D.O.'s trips to and from school, on each of the 201 school days attended (402 trips), for a total of $162,810.

- Crosley is entitled to $405 per trip, *see* Crosley Decl. ¶ 25, for the cost of Z.C.'s trips to and from school, on each of the 206 school days attended (412 trips), for a total of $166,860.

- Cornett is entitled to $345 per trip, *see* Cornett Decl. ¶ 25, for the cost of J.B.'s trips to and from school, on each of the 82 school days attended minus the two times Cornett's husband drove J.B. to school (162 trips), for a total of $55,890.

- Donohue is entitled to $233 per trip, *see* Donohue Decl. ¶ 25, for the cost of S.J.D.'s trips to and from school, on each of the 203 school days attended (406 trips), for a total of $94,598.

### V. Conclusion

For the foregoing reasons, the Court concludes that Plaintiff Jumoke Ogunleye should be reimbursed $162,810, Plaintiff Crysal Crosley should be reimbursed $166,860, Plaintiff Donna Cornett should be reimbursed $55,890, and Plaintiff Patrick Donohue should be reimbursed $94,598. Within fourteen days of this Opinion and Order, Plaintiffs should submit a letter stating whether they intend to move for an award of attorneys' fees.

The Clerk of Court also is respectfully directed to substitute Kamar Samuels, in his official capacity as Chancellor of the New York City Department of Education, for David C. Banks, and Mark Levine, in his official capacity as Comptroller of the City of New York, for Brad Lander, as Defendants in the caption of this case.

Within twenty-one days of this Opinion and Order, Plaintiffs also must submit a letter showing cause why Mark Levine should not be dismissed as a Defendant. The IDEA grants

---

[6] Defendants do not challenge the reasonableness of the daily transportation rates charged by Sisters. In the absence of a dispute, the Court adopts those rates. But in doing so, the Court makes no finding as to whether the transportation rates Sisters charged Plaintiffs were reasonable.

parents a cause of action against the local education agency, which in this case, is the New York City Department of Education. *See Y.D. v. N.Y.C. Dep't of Educ.*, No. 14 Civ. 1137 (LTS), 2016 WL 698139, at *4-5 (S.D.N.Y. Feb. 19, 2016). But New York City—and by extension, Mark Levine, in his official capacity as New York City's Comptroller—is typically considered "a separate legal entity" from the New York City Department of Education. *Romero v. City of New York*, 839 F. Supp. 2d 588, 601 (E.D.N.Y. 2012). Plaintiffs therefore must explain why Mark Levine is a proper Defendant in this case.

SO ORDERED.

Dated: June 8, 2026
New York, New York

_____
JOHN P. CRONAN
United States District Judge

22